## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PERFECTION BAKERIES, INC.,** | ] | |
| | ] | |
| **Plaintiff-Counter Defendant,** | ] | |
| | ] | |
| **v.** | ] | **2:22-cv-573-ACA** |
| | ] | |
| **RETAIL WHOLESALE AND** | ] | |
| **DEPARTMENT STORE** | ] | |
| **INTERNATIONAL UNION AND** | ] | |
| **INDUSTRY PENSION FUND,** | ] | |
| | ] | |
| **Defendant-Counterclaimant.** | ] | |

## MEMORANDUM OPINION

Perfection Bakeries, Inc. makes breads, buns, muffins, and other bakery products. Some of its employees in Saginaw, Michigan and Fort Wayne, Indiana were members of different Locals of the Retail, Wholesale and Department Store Union. As a result, Perfection Bakeries contributed to a pension plan for those employees. In 2016, Perfection Bakeries stopped offering pension benefits to union employees in Saginaw, Michigan. Two years later, it completely withdrew from the plan.

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, an employer that withdraws from a pension plan to which it has previously contributed must pay a penalty called its "withdrawal liability." As the Supreme Court has explained, this penalty "cover[s] that employer's fair share

of the plan's unfunded liabilities." *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 415 (1995). The Retail Wholesale and Department Store International Union and Industry Pension Fund ("the Fund") calculated Perfection Bakeries' withdrawal liabilities for both the partial withdrawal and the complete withdrawal. Though the parties agree that the Fund correctly calculated the partial withdrawal liability, they dispute the proper way to calculate the complete withdrawal liability.

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381(b), sets out a formula to calculate an employer's withdrawal liability. The formula calls for the plan sponsor to calculate the withdrawing employer's "allocable amount of unfunded vested benefits" (*i.e.*, its proportional share of the plan's underfunding) and then to apply four potential adjustments to that number. *Id.* A separate section of the MPPAA provides that where an employer incurs withdrawal liability in successive withdrawals from the plan, the later withdrawal liability "shall be reduced" by the earlier withdrawal liability. *Id.* § 1386(b)(1). The parties refer to this reduction as the "partial withdrawal liability credit." This court will use the same terminology or call it simply "the credit."

The parties' disagreement centers on where to apply the partial withdrawal liability credit when calculating the complete withdrawal liability. The Fund contends that the credit is applied as part of the second potential adjustment

described in § 1381(b). Perfection Bakeries contends that the credit is not one of the adjustments but is instead applied after all the adjustments. An arbitrator agreed with the Fund and ordered Perfection Bakeries to pay both withdrawal liabilities assessed by the Fund.

Perfection Bakeries then filed this lawsuit, seeking modification or vacatur of the arbitration award and an order directing the Fund to recalculate the 2018 complete withdrawal liability. The Fund counterclaimed, seeking to enforce and confirm the arbitrator's award. The parties then cross-moved for summary judgment. (Docs. 29, 36). Because the court interprets the statute to require application of the credit as part of the second potential adjustment, the court **WILL DENY** Perfection Bakeries' motion for summary judgment and **WILL GRANT** the Fund's motion for summary judgment.

## I.    BACKGROUND

Normally on cross-motions for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018) (quotation marks omitted). But this case involves review of an arbitrator's award, 29 U.S.C. § 1401(b)(2), requiring the court to apply a different standard, *see Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps. v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004).

The court must review the arbitrator's findings of fact for clear error and his conclusions of law *de novo*. *Id.* No party challenges any of the arbitrator's factual findings; the only dispute is about how to interpret 26 U.S.C. §§ 1381(b) and 1386(b). The court's review is therefore *de novo*.

### 1. Legal Framework

ERISA "seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320–21 (2016). One of ERISA's main purposes "was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). As a result, "ERISA required employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 416.

But employers can withdraw from pension plans. *Cf.* 29 U.S.C. §§ 1383, 1385. The withdrawal can be complete (when an employer "permanently ceases to have any obligation to contribute under the plan" or "permanently ceases all covered operations under the plan") or partial (when the employer's contributions decline by

70% or the employer's contribution obligation partially ceases). *Id.* §§ 1383(a), 1385(a).

To address concerns about employers withdrawing from underfunded pension plans, "ensuring the plan's demise," Congress passed the MPPAA, 29 U.S.C. §§ 1381–1461. *See Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417. The MPPAA "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan." *Pension Benefit Guar. Corp.*, 467 U.S. at 725; *see also Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 415 ("[The MPPAA] provides that an employer who withdraws from an underfunded multiemployer pension plan must pay a charge sufficient to cover that employer's fair share of the plan's unfunded liabilities.") (citation omitted); *Connors v. Ryan's Coal Co.*, 923 F.2d 1461, 1463 (11th Cir. 1991) ("The basic concept of the provision is that each employer, in addition to the contributions to the plan pursuant to collective bargaining agreements, owes a share of the unfunded vested liability of the plan to its beneficiaries."). That debt is the employer's "withdrawal liability," and the employer incurs that liability whether the withdrawal is partial or complete. *See* 29 U.S.C. § 1381(a) ("If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."); *Pension Benefit Guar. Corp.*, 467 U.S. at 725.

The MPPAA sets out a formula for calculating an employer's withdrawal liability:

> The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted--
>
> (A)  first, by any de minimis reduction applicable under section 1389 of this title,
>
> (B)  next, in the case of a partial withdrawal, in accordance with section 1386 of this title,
>
> (C)  then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title, and
>
> (D)  finally, in accordance with section 1405 of this title.

29 U.S.C. § 1381(b)(1).

### a. The Allocable Amount of Unfunded Vested Benefits

The starting point for the calculation is "the allocable amount of unfunded vested benefits." *Id.* This is the withdrawing employer's proportional share of "the value of nonforfeitable benefits under the plan, less . . . the value of the assets of the plan." *Id.* § 1393(c); *see generally id.* § 1391. To put it more simply, this is the "withdrawing employer's fair share of a plan's underfunding." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417 (stating that § 1391 "explains (a) how to determine a plan's total underfunding; and (b) how to determine an employer's fair share (based primarily upon the comparative number of that employer's covered workers in each earlier year and the related level of that employer's contributions)").

After calculating the allocable amount of unfunded vested benefits, the plan sponsor then applies four potential adjustments to that number, in sequential order, to reach the employer's withdrawal liability. *See* 29 U.S.C. § 1381(b)(1) ("[F]irst . . . next . . . then . . . finally . . . ."). Some, none, or all of the potential adjustments may be applicable in any given withdrawal. *See id.*

### b. *First Potential Adjustment: The de Minimis Reduction*

The first potential adjustment is "any de minimis reduction applicable under section 1389 of this title." 29 U.S.C. § 1381(b)(1)(A). Section 1389 describes how to calculate the potential reduction to the allocable amount of unfunded vested benefits as well as situations in which the de minimis reduction will not apply. *Id.* § 1389. Because the specifics of this section do not matter in resolving this case (*see* doc. 32 at 32 n.16; doc. 33 at 16), the court will not delve any deeper into the de minimis adjustment.

### c. *Second Potential Adjustment: The Partial Withdrawal Adjustment*

Section 1381(b)(1)(B) sets out the second potential adjustment. It provides: "[I]n the case of a partial withdrawal, in accordance with section 1386 of this title." 29 U.S.C. § 1381(b)(1)(B). This sentence is the heart of the dispute in this case, because § 1386 does two things. Section 1386(a) describes how to prorate an employer's allocable amount of unfunded vested benefits, adjusted by the de minimis reduction, to account for the fact that the employer only partially withdrew.

*Id.* § 1386(a). Section 1386(b) describes the partial withdrawal liability credit and directs the Pension Benefit Guaranty Corporation ("PBGC"), a federally chartered corporation, to prescribe regulations governing the credit. *Id.* § 1386(b); *see* 29 U.S.C. § 1302(a); *Pension Benefit Guar. Corp. v. 50509 Marine LLC*, 981 F.3d 927, 929 (11th Cir. 2020). The Fund asserts that the reference to § 1386 in § 1381(b)(1)(B) incorporates both the proration calculation and the credit; Perfection Bakeries asserts that the reference to § 1386 incorporates only the proration calculation. (Doc. 32 at 20; doc. 33 at 6–7).

Because § 1386 is central to the dispute in this case, the court will describe it in detail. As noted in the preceding paragraph, § 1386(a) describes how to perform the proration required to account for a partial withdrawal:

> The amount of an employer's liability for a partial withdrawal, before application of sections 1399(c)(1) and 1405 of this title, is equal to the product of . . . the amount determined under section 1391 of this title, and adjusted under section 1389 of this title if appropriate, determined as if the employer had withdrawn from the plan in a complete withdrawal . . . multiplied by [a fraction derived from the employer's contributions during a specified period of time].

29 U.S.C. § 1386(a). In simpler terms, § 1386(a) directs the Fund to calculate the allocable amount of unfunded vested benefits (as if the withdrawal were complete), apply the de minimis reduction if applicable, and then prorate that number to account for the fact that the withdrawal is partial. *See id.* After proration, the fund must apply the two final potential adjustments if applicable. *Id.*

Neither party disputes this reading of § 1386(a) or how it interacts with § 1381(b)(1)(B). (*See* doc. 32 at 31; doc. 39 at 24). They diverge about whether § 1381(b)(1)(B) also incorporates § 1386(b). (*See generally* doc. 32 at 18; doc. 33 at 6). Section 1386(b) first provides instructions for how to account for an employer's successive withdrawals from a plan:

> In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

29 U.S.C. § 1386(b)(1).

To simplify, § 1386(b)(1) addresses a situation in which an employer partially withdraws from a plan and is assessed partial withdrawal liability, then in a later year partially or completely withdraws from the same plan and is again assessed withdrawal liability. It mandates that, in that situation, the plan sponsor must "reduce[ ]" the later withdrawal liability "by the amount of any partial withdrawal liability" from the earlier year. *Id.* The Fund contends that the reduction mandated by § 1386(b) takes place during the second potential adjustment described in § 1381(b)(1)(B); Perfection Bakeries contends that it does not occur until after all four potential adjustments have been applied. (Doc. 32 at 20; doc. 33 at 6–7).

Section 1386(b)(2) then directs the PBGC to prescribe regulations "to provide for proper adjustments in the reduction provided by paragraph (1) . . . so that the

liability for any complete or partial withdrawal in any subsequent year (after the application of the reduction) properly reflects the employer's share of liability with respect to the plan." 29 U.S.C. § 1386(b)(2). In compliance with that directive, the PBGC promulgated 29 C.F.R. §§ 4206.1 to 4206.10. One of those regulations provides that the partial withdrawal credit must equal or exceed zero:

> Whenever an employer that was assessed withdrawal liability for a partial withdrawal from a plan partially or completely withdraws from that plan in a subsequent plan year, it shall receive a credit against the new withdrawal liability in an amount greater than or equal to zero, determined in accordance with this part. If the credit determined under [the regulations] is less than zero, the amount of the credit shall equal zero.

29 C.F.R. § 4206.3.

### d. Third Potential Adjustment: The 20-Year Cap

The third potential adjustment under § 1381(b) is "to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title." 29 U.S.C. § 1381(b)(1)(C). Section 1399(c)(1)(B) describes the so-called "20-year cap." (*See* doc. 32 at 17; doc. 33 at 7). Understanding the 20-year cap requires a brief overview of § 1399 in general.

Section 1399 gives withdrawing employers a choice about how to pay the withdrawal liability: in a lump sum payment or in installments. *See* 29 U.S.C. § 1399(c)(1), (c)(4); *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418. Section 1399(c)(1)(A)(i) provides that, with some exceptions, "an employer shall

pay the amount determined under section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under section 1386 of this title over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C)." Subparagraph (C) "(roughly speaking) equals the withdrawing employer's typical contribution in earlier years." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418; *see* 29 U.S.C. § 1399(c)(1)(C).

In plain language, § 1399(c) requires the plan sponsor to calculate the allocable amount of unfunded vested benefits, apply the first two potential adjustments, and then calculate how long it would take to pay that amount (plus interest) if the employer continued its previous rate of contributions.[1] If it would take more than twenty years to pay, "the employer's liability shall be limited to the first 20 annual payments." 29 U.S.C. § 1399(c)(1)(B). This is the "20-year cap"—it is a cap on the amount of money a plan can collect from a withdrawing employer.

---

[1] The Supreme Court has provided a helpful illustration:

[A]ssume that an employer withdraws from an underfunded plan . . . ; that the withdrawal [liability] . . . is $23.3 million; that the employer normally contributes about $4 million per year to the plan; and that the plan uses a 7% interest rate. In that case, the statute asks: "How many annual payments of about $4 million does it take to pay off a debt of $23.3 million if the interest rate is 7%?"

*Milwaukee Brewery Workers Pension Plan*, 513 U.S. at 419.

### e.  Fourth Potential Adjustment: The § 1405 Adjustment

The fourth and final potential adjustment is "in accordance with section 1405 of this title." 29 U.S.C. § 1381(b)(1)(D). Section 1405—which is titled "[l]imitation on withdrawal liability"—describes how to adjust the "unfunded vested benefits allocable to an employer" when the employer is either selling substantially all of its assets in an arm's-length transaction to an unrelated party or when the employer is undergoing liquidation or dissolution. *Id.* § 1405(a)–(b). Section 1405(a), which addresses a sale of substantially all the employer's assets, specifically provides for a cap on "the unfunded vested benefits allocable to an employer (after the application of all sections of this part having a lower number designation than this section)." *Id.* § 1405(a)(1).

### f.  Pension Benefit Guaranty Corporation Opinion Letter 85-4[2]

The PBGC is a federally chartered corporation "charged with protecting the retirement incomes of workers in private-sector defined benefit pension plans." *Pension Benefit Guar. Corp.*, 981 F.3d at 929; *see* 29 U.S.C. § 1302(a). In 1985, the PBGC issued Opinion Letter 85-4 to address a question about how a plan sponsor accounts for a previous partial withdrawal when calculating a later, successive withdrawal. U.S. Dep't of Labor, Pension Benefit Guar. Corp., Opinion Letter 85-4

---

[2] Although Opinion Letter 85-4 does not appear in the record, the court takes judicial notice of it. *See* Fed. R. Evid. 201(b).

(Jan. 30, 1985). Opinion Letter 85-4 acknowledged two potential methods. In the first method, the plan sponsor calculates the second withdrawal liability "without regard to the prior year's partial withdrawal[ ] and then reduces the current amount of withdrawal liability by the amount of the previously assessed liability." *Id.* at 1. A calculation performed under the first method would look like this:

Step 1:   Calculate the allocable amount of unfunded vested benefits (§ [1391])

Step 2:   Subtract de minimis deductible, if any (§ [1389])

Step 3:   If partial withdrawal has occurred, multiply by partial withdrawal fraction (§ [1386(a)])

Step 4:   Make any additional adjustments required by [§ 1381(b)] (§§ [1399, 1405])

Step 5:   Reduce withdrawal liability by the amount of any previously assessed partial withdrawal liability (§ [1386(b)(1)])

*Id.* (one alteration omitted).

In the second method described in Opinion Letter 85-4, the plan sponsor calculates the allocable amount of unfunded vested benefits, subtracts any de minimis reduction, subtracts any prior year's partial withdrawal liability, and then completes the remaining steps. *Id.* at 1. A calculation performed under the second method would look like this:

Step 1:   Calculate the allocable amount of unfunded vested benefits (§ [1391])

Step 2:   Subtract de minimis deductible, if any (§ [1389])

Step 3: Subtract amount of any previously assessed partial withdrawal liability (§ [1386(b)(1)])

Step 4: If partial withdrawal has occurred, multiply by partial withdrawal fraction (§ [1386(a)])

Step 5: Make any additional adjustments required by Section [1381(b)] (§§ [1399, 1405])

Opinion Letter 85-4 at 1 (one alteration omitted).

The PBGC opined that "Method 1 is correct and Method 2 is clearly erroneous." *Id.* It explained that § 1381(b)(1) "defines withdrawal liability as the result of four potential adjustments to an employer's allocable amount of unfunded vested benefits." *Id.* None of those potential adjustments include application of the partial withdrawal liability credit. *Id.* In the PBGC's opinion, two reasons supported its interpretation that § 1386(b) is not a part of the potential adjustment set out in § 1381(b)(1)(B).

First, by its own terms, § 1386(b) promises a reduction to "withdrawal liability." Opinion Letter 85-4 at 2. The PBGC considered the MPPAA to provide a specific definition of "withdrawal liability": the amount reached after applying all four potential adjustments. *See id.* And, if "withdrawal liability" is reached only after applying all adjustments, it is not possible for one of the adjustments to include a credit to "withdrawal liability." *See id.* In other words, the PBGC believed that if the § 1386(b) reduction were applied as one of the potential adjustments, it would

actually be an adjustment to the "allocable amount of unfunded vested benefits" instead of the "withdrawal liability."

Second, the PBGC highlighted the fact that the second potential adjustment applies only "in the case of a partial withdrawal," Opinion Letter 85-4 at 1, while § 1386(b) "applies to either a partial or complete withdrawal," *id.* at 2 (alteration omitted). Given these two reasons, the PBGC concluded that "the reduction in an employer's withdrawal liability required by [§ 1386(b)(1)] on account of a previous partial withdrawal assessment must be made after the employer's subsequent withdrawal liability is calculated in accordance with [§ 1381(b)] (without regard to [§ 1386(b)(1)])." *Id.* In short, the PBGC opined that § 1381(b)(1)(B)'s reference to § 1386 was really only to § 1386(a).

### g. Ninth Circuit Decision

In 2018, the Ninth Circuit issued its decision in *GCUI-Employer Retirement Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214, 1216 (9th Cir. 2018), approving the second method described in Opinion Letter 85-4—the method the PBGC disfavored. The Ninth Circuit rejected Opinion Letter 85-4 as unpersuasive and a misconstruction of the statute's plain language. *Id.* at 1218–19. Instead, it held that given § 1381(b)'s sequential language, the plan sponsor must apply any partial withdrawal liability credit *before* the 20-year cap. *Id.* at 1218.

In the Ninth Circuit's view, an employer's withdrawal liability is determined by calculating the allocable amount of unfunded vested benefits, subtracting any de minimis liability, and then crediting any prior partial withdrawals. *Id.* This is because the § 1386(b) credit "reduces the employer's complete withdrawal liability" while the 20-year cap "forgives debt" and "can only logically be applied after that withdrawal liability is calculated." *Id.*

2.  Facts

Perfection Bakeries makes and distributes baked goods. (Doc. 31-23 at 2 ¶ 8). It operated facilities in Saginaw, Michigan and Ft. Wayne, Indiana, where some of its employees were members of different Locals of the Retail, Wholesale and Department Store Union. (*Id.* at 2 ¶¶ 9, 11). Perfection Bakeries contributed to a multiemployer pension fund for its employees consistent with its collective bargaining agreements, Perfection Bakeries had to contribute to a multiemployer pension fund—the Fund in this case. (*Id.*; doc. 1 at 4 ¶ 28; doc. 14 at 4 ¶ 28).

Perfection Bakeries partially withdrew from the pension plan in 2016 and completely withdrew from the plan in 2018. (Doc. 31-23 at 2–3 ¶¶ 13–14). In 2019, the Fund assessed Perfection Bakeries' partial withdrawal liability for the 2016 partial withdrawal and its complete withdrawal liability for the 2018 complete withdrawal. (*Id.* at 2–3 ¶¶ 13–14, 4 ¶ 28–29). The parties agree that Perfection Bakeries' 2016 partial withdrawal liability was $2,228,268 and that its partial

withdrawal liability credit amounts to $1,962,408.[3] (*Id.* at 3 ¶ 21; doc. 32 at 15 ¶ 50(1); doc. 39 at 10–13). The parties also agree that, for the starting point of the calculation, the allocable amount of unfunded vested benefits for the 2018 complete withdrawal was $17,331,978 and that the first adjustment is inapplicable. (Doc. 33 at 10 ¶ 11; doc. 38 at 5 ¶ 11; *see also* doc. 31-34 at 48). This is where the parties part ways.

In applying the second potential adjustment, the Fund, following the Ninth Circuit's *Quad/Graphics* decision, calculated a credit of $1,962,408 based on Perfection Bakeries' 2016 partial withdrawal liability and subtracted that credit from the allocable amount of unfunded vested benefits, yielding $15,369.570. (Doc. 31-34 at 48; *see* doc. 31-2 at 45–46, 163). The Fund then applied the third potential adjustment—the 20-year cap—to reach $6,318,741. (Doc. 31-34 at 48). Because no further adjustments applied (*see* doc. 31-34 at 48; *see also* doc. 31-2 at 127), the Fund determined that Perfection Bakers' withdrawal liability for the 2018 complete withdrawal was $6,318,741. (Doc. 31-2 at 130; *see* doc. 31-34 at 48).

Perfection Bakery contends the second potential adjustment does not apply because the 2018 withdrawal was a complete, not a partial, withdrawal. (*Id.* at 3; *see also id.* at 5). It asserts that, at the third potential adjustment, the 20-year cap reduced

---

[3] The Fund initially calculated a different credit for the partial withdrawal, but the arbitrator ordered recalculation. (*See* doc. 1-1 at 45). The court uses the number the Fund provided after recalculating the credit.

the result to $6,318,741 and that the fourth potential adjustment was also inapplicable. (*Id.* at 4; *compare* doc. 31-34 at 48). At this point, Perfection Bakeries contends, the partial withdrawal liability credit of $1,962,408 should be applied to reduce its complete withdrawal liability to $4,090,473. (Doc. 31-11 at 4).[4]

In summary, the Fund's calculation results in a complete withdrawal liability of $6,318,741. (*See id.* at 4–5). Perfection Bakeries' calculation results in a complete withdrawal liability of $4,090,473. (*See id.* at 4). Perfection Bakeries requested arbitration as to the assessments of withdrawal liability for the 2016 and 2018 withdrawals. (Doc. 1 at 5 ¶ 34; doc. 14 at 4 ¶ 34). The arbitrator agreed with the Fund that the partial withdrawal liability credit should be applied as part of the second potential adjustment and ordered Perfection Bakeries to pay the assessed withdrawal liabilities for the 2016 partial withdrawal and the 2018 complete withdrawal.[5] (Doc. 1-1 at 36–41, 46).

## II.   DISCUSSION

Perfection Bakeries moves for summary judgment in its favor on its claim seeking to vacate or modify the arbitrator's decision. (Doc. 36 at 1; *see* doc. 1 at 8–9). The Fund moves for summary judgment in its favor on its counterclaim seeking

---

[4] The expert report cited here uses the partial withdrawal liability credit that the Fund originally calculated. The arbitrator later ordered the Fund to recalculate the credit. (Doc. 1-1 at 46). The court uses the corrected credit.

[5] The arbitrator also found that the Fund had erred in its calculation of the amount of the partial withdrawal liability credit and ordered the Fund to recalculate that amount. (Doc. 1-1 at 46). Neither party challenges that part of the arbitrator's decision.

to enforce and confirm the arbitrator's decision. (Doc. 29 at 1; *see* doc. 14 at 7–9). The question central to each motion is simple: does the MPPAA require application of the partial withdrawal liability credit as part of the second potential adjustment or after application of all four potential adjustments? The answer is also simple: the MPPAA requires application of the credit as part of the second potential adjustment. But getting to that answer is not so simple.

It is axiomatic that a court interpreting a statutory provision must begin by looking to "the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) (quotation marks omitted). Although the court has described § 1381 in detail already, the importance of the specific language in the section warrants quoting it again.

First, § 1381 provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). Section 1381(b) then describes how to calculate the withdrawal liability: first by calculating the allocable amount of unfunded vested benefits, then adjusting that amount by four potential adjustments:

> (A)  first, by any de minimis reduction applicable under section 1389 of this title,
>
> (B)  next, in the case of a partial withdrawal, in accordance with section 1386 of this title,

19

     (C)   then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title, and

     (D)   finally, in accordance with section 1405 of this title.

29 U.S.C. § 1381(b)(1).

Section 1381(b)(1)(B) refers to § 1386, which has two subsections. Section 1386(a) sets out how to prorate the allocable amount of unfunded vested benefits, adjusted by any applicable de minimis reduction, to account for an employer's withdrawal being partial. *Id.* § 1386(a). And § 1386(b)(1) mandates application of the partial withdrawal liability credit in cases involving an employer's successive withdrawals from a plan. *Id.* § 1386(b)(1).

Perfection Bakeries' position is essentially that "next, in the case of a partial withdrawal, in accordance with *section 1386* of this title" really means "next, in the case of a partial withdrawal, in accordance with *section 1386(a)* of this title." (*See generally* doc. 32). Perfection Bakeries makes two arguments in support of its position: (1) the terms "withdrawal liability," "adjustment," and "reduction" have specific meanings that, if used correctly, establish the necessity of applying the credit after all the potential adjustments; and (2) to the extent the statute is ambiguous, this court should defer to the PBGC's opinion letter and regulations. (Doc. 32 at 16–45; doc. 38 at 12–31). The Fund argues that (1) the plain language of § 1381(b)(1)(B) requires application of the credit as part of the second potential adjustment; (2) the statute does not define "withdrawal liability," "adjustment," and "reduction" in the

ways Perfection Bakeries asserts; and (3) the PBGC's opinion letter does not warrant any deference because the statute is unambiguous. (Doc. 33 at 14–21; doc. 39 at 14–37; doc. 41 at 6–10).

Although the text of § 1381(b)(1)(B) does not speak in the clearest terms and the court does not find the reasoning in *Quad/Graphics* persuasive, the court ultimately agrees that "in the case of a partial withdrawal, in accordance with section 1386" incorporates all of § 1386, so that the partial withdrawal liability credit must be applied as part of the second potential adjustment.

The court will address the *Quad/Graphics* opinion first. Of course, the Ninth Circuit's opinion is not binding on this court, though it may have persuasive value. *Cf. McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004). In this case, the court finds a significant part of the Ninth Circuit's reasoning unpersuasive. The Court first correctly held that the unambiguous words of the statute require application of the credit as part of the second potential adjustment. *Quad/Graphics*, 909 F.3d at 1218. But having interpreted the plain language of the statute, the Ninth Circuit went on to conduct an atextual interpretation based on language, not from the statute, but from a Supreme Court decision that described the 20-year cap as a "debt forgiveness provision." *Id.* The Ninth Circuit reasoned that because the 20-year cap forgives debt, it "can only logically be applied after [the] withdrawal liability is calculated. The § 1386(b) credit reduces the employer's debt, and an

employer cannot be forgiven a debt for which it is not liable." *Quad/Graphics*, 909 F.3d at 1218 (citation omitted).

This atextual interpretation of the statute is not persuasive. For one thing, it ignores the existence of the fourth potential adjustment, which by the statute's terms must be applied after the 20-year cap. *See* 29 U.S.C. § 1381(b)(1)(D). For another, the Supreme Court's reference to the 20-year cap as a debt forgiveness provision came in a case that had nothing to do with the order of operations in calculating an employer's withdrawal liability. *See generally Milwaukee Brewery Workers' Pension Plan*, 513 U.S. 414. Instead, that case involved when interest begins to accrue after an employer's withdrawal. *See id.* at 416. The Supreme Court used the phrase "debt forgiveness" to assist in conceptualizing the amortization calculation required under the statute. *Id.* at 419. The Supreme Court did not, by referring to the 20-year cap as a debt forgiveness provision, hold or even imply anything about the meaning of the term "withdrawal liability."

Nevertheless, the court does agree that the statute unambiguously requires the credit to be applied as part of the second potential adjustment. The second potential adjustment provides: "next, in the case of a partial withdrawal, in accordance with section 1386 of this title." 29 U.S.C. § 1381(b)(1)(B). The tension here is between the phrase "in the case of a partial withdrawal" and the reference to "section 1386" without specification of a subsection. At first glance, "in the case of a partial

withdrawal" appears to limit application of the adjustment to situations in which a plan sponsor is calculating an employer's liability for a partial withdrawal, thereby excluding situations in which the employer's withdrawal is complete. *See, e.g.*, A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("*Reading Law*") (describing the negative-implication canon, which provides that "[t]he expression of one thing implies the exclusion of others"); *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 949 (11th Cir. 2022) ("One familiar canon of statutory construction is 'expressio unius est exclusio alterius,' which explains that the mention of one thing implies the exclusion of another.") (some quotation marks omitted). But "[n]o canon of interpretation is absolute. Each may be overcome by the strength of differing principles that point in other directions." *Reading Law* 59. Here, other principles overcome the negative-implication canon.

For example, § 1381(b)(1)(B) could easily have specified "section 1386(a)" if the drafters meant for the second potential adjustment to consist only of proration for current partial withdrawal calculations. *See Reading Law* 93 (explaining that under the omitted-case canon, "[n]othing is to be added to what the text states or reasonably implies"). The drafters did exactly that in the third potential adjustment, which specifies the applicable subsection, paragraph, and subparagraph of § 1399 to apply as an adjustment. *See* 29 U.S.C. § 1381(b)(1)(C). This indicates that Congress's decision to incorporate all of § 1386 was deliberate, rather than oversight

or an unwritten implication. *See Reading Law* 167 (describing the whole-text cannon, "which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts"). Congress could also have included a fifth potential adjustment if it had intended for the credit to be applied at a different part of the calculation.

The whole-text canon supports this interpretation of the statute in other ways. Most significantly, the fourth potential adjustment is described as being the "final[ ]" adjustment. *See* 29 U.S.C. § 1381(b)(1)(D). That adjustment can be found in § 1405, which sets out limitations on an employer's allocable amount of unfunded vested benefits in two specific situations. *Id.* § 1405(a)–(b). Of particular relevance is the part of § 1405(a)(1) stating that when calculating withdrawal liability in one of those situations, "the unfunded vested benefits allocable to an employer (*after the application of all sections of this part having a lower number designation than this section*) . . . shall not exceed" certain amounts. *Id.* § 1405(a)(1) (emphasis added). By its clear and unambiguous terms, § 1405(a)(1) requires application of *all* of § 1386 before the fourth potential adjustment can be applied.

Similarly, § 1399(c)(1)(A)(i)—which generally describes the 20-year cap— requires the fund to calculate the allocable amount of unfunded vested benefits under § 1391, "adjusted if appropriate first under section 1389 of this title and then under section 1386 of this title." As in § 1381(b), the reference is to § 1386 as a whole, not

to any particular subsection of § 1386. The court rejects Perfection Bakeries'
argument that "if appropriate" implicitly excludes § 1386(b) from the reference to
§ 1386 as a whole. "If appropriate" is more naturally read to refer to *any* potential
adjustment found in § 1389 or § 1386.

The text of the MPPAA unambiguously indicates that the second adjustment
includes the credit set out in § 1386(b). The phrase "in the case of a partial
withdrawal," 29 U.S.C. § 1381(b)(1)(B), does not overcome the clarity of the rest of
the statute. As the Fund argues and the arbitrator found, there is an interpretation of
"in the case of a partial withdrawal" that permits that language to perform a function
while still honoring the rest of the text. "In the case of a partial withdrawal" could
bear two meanings: (1) "where an employer's current withdrawal is partial"; and
(2) "where an employer has liability for a previous partial withdrawal." (Doc. 39 at
27–28; doc. 1-1 at 36–37).

Perfection Bakeries contends that this interpretation is incorrect because
§ 1381(b)(3) defines "partial withdrawal" by reference to 29 U.S.C. § 1385, which
in turn sets out the ways to tell if an employer has partially withdrawn from a plan.
(Doc. 32 at 27–28). According to Perfection Bakeries, because § 1385 does not
mention the credit, "in the case of a partial withdrawal" must mean "in the case of a
current partial withdrawal" and cannot include situations in which an employer's
previous withdrawal was partial. (*Id.* at 28–29). Any other interpretation is,

according to Perfection Bakeries, a rewrite of the statute. (*Id.* at 30–31). The court disagrees. Interpreting "in the case of a partial withdrawal" to trigger application of the adjustment whenever a partial withdrawal *has occurred* or *is occurring* is consistent with the plain language of § 1381(b)(1)(B) and the MPPAA as a whole. Indeed, given the clarity of the rest of the statute—in particular § 1405(a)(1)—any other reading could lead to a situation where the credit cannot be applied at all.

For example, an employer might partially withdraw then completely withdrew via a bona fide sale qualifying for an adjustment under § 1405(a)(1). Under Perfection Bakeries' reading, the partial withdrawal credit in § 1386(b) could not be applied as part of the second potential adjustment because the bona fide sale amounts to a complete withdrawal. But the "final" adjustment under § 1405 *requires* application of every section of the part "having a lower number designation than" § 1405. 29 U.S.C. § 1405(a)(1). In that situation, if the credit could not be applied at the second potential adjustment and could not be applied after the final adjustment, it could not be applied at all.

In sum, the court finds that, although § 1381(b)(1)(B) is not drafted in the clearest of terms, the canons of statutory interpretation support the Fund's reading of the statute. That ends the court's inquiry. But for the sake of completeness, the court will address Perfection Bakeries' remaining arguments.

Perfection Bakeries contends that the Fund's own actuary admitted at the arbitration that it does not make sense to use the previous partial withdrawal liability, which was capped under § 1399(c)(1)(B), to calculate a credit that will be applied against the uncapped allocable amount of unfunded vested benefits. (Doc. 32 at 46). Even if the court found Perfection Bakeries' characterization of the expert's testimony accurate, it does not find a witness's opinion about the actuarial sense of a calculation persuasive in interpreting the meaning of a statute. And even if the formula mandated by Congress were unfair or inconsistent, it is not the place of the court to rewrite or interpret the statute purposively to correct a perceived flaw in it. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) ("[A] policy concern cannot justify supplanting the text's plain meaning. It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended.") (citation and quotation marks omitted).

Perfection Bakeries' next argument is that "[t]he purpose of the credit is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits of the plan." 29 C.F.R. § 4206.1(a); *see* 29 U.S.C. § 1386(b)(2) (directing the PBGC to prescribe regulations for calculating the credit "so that the liability for any complete or partial withdrawal in any subsequent year . . . properly reflects the employer's share of liability with respect to the plan"); (*see* doc. 32 at

46). The court notes that the statement of purpose Perfection Bakeries relies on is from the PBGC, not Congress. *See* 29 C.F.R. § 4206.1(a). Nevertheless, even assuming that such a statement of purpose made in an agency's regulation could impact the court's interpretation of a statute, Perfection Bakeries has not established that application of the credit before the cap resulted in charging Perfection Bakeries twice for the same unfunded vested benefits of the plan.

Finally, Perfection Bakeries urges this court to find that, if its interpretation of the statute is unpersuasive, the statute is ambiguous and the PCBG's regulations and opinion letter are entitled to deference. As stated above, the statute is not ambiguous. But in the interest of completeness, the court finds in the alternative that neither the regulation nor the opinion letter alter the analysis. Section 4206.3 provides that if a withdrawing employer already has withdrawal liability from an earlier plan year, the employer "shall receive a credit against the new withdrawal liability in an amount greater than or equal to zero." 29 C.F.R. § 4206.3. To the extent the statute is ambiguous, the regulation does not clarify it, because it does not say anything about whether the credit must be applied as part of the second potential adjustment or after all adjustments have been made.

As for Opinion Letter 85-4, the court finds it unpersuasive. Agency opinions are "entitled to respect under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade." *Gregory v.*

*First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009) (cleaned up). The persuasiveness of an opinion letter rests on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Perfection Bakeries' only argument about the persuasiveness of the opinion letter is that it is consistent with the text of the statute. But as the court has already found, the text of the statute is clear and requires application of the credit as part of the second potential adjustment. The court has considered the other factors on its own, but does not find the opinion persuasive.

## III.   CONCLUSION

The court **WILL DENY** Perfection Bakeries' motion for summary judgment and **WILL GRANT** the Fund's motion for summary judgment. The court **WILL ENTER FINAL JUDGMENT** enforcing the arbitrator's award.

**DONE** and **ORDERED** this July 7, 2023.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE